LANE *v.* PENA, SECRETARY OF TRANSPORTATION,
ET AL.

No. 95–365.   Argued April 15, 1996—Decided June 20, 1996

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BREYER, J., joined, *post*, p. 200.

*Walter A. Smith, Jr.,* argued the cause for petitioner. With him on the briefs were *Daniel B. Kohrman, Audrey J. Anderson, Arthur B. Spitzer,* and *Steven R. Shapiro.*

*Beth S. Brinkmann* argued the cause for respondents. With her on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Barbara C. Biddle,* and *Christine N. Kohl.**

---

*Linda D. Kilb, Arlene B. Mayerson,* and *Patricia Shiu* filed a brief for the American Association of Retired Persons et al. as *amici curiae* urging reversal.

*Michael A. Greene* and *Jerry W. Lee* filed a brief for the American Diabetes Association as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Section 504(a) of the Rehabilitation Act of 1973, 87 Stat. 355, 29 U. S. C. § 791 *et seq.* (Act or Rehabilitation Act), prohibits, among other things, discrimination on the basis of disability "under any program or activity conducted by any Executive agency." 29 U. S. C. § 794(a) (1988 ed., Supp. V). The question presented in this case is whether Congress has waived the Federal Government's sovereign immunity against awards of monetary damages for violations of this provision.

I

The United States Merchant Marine Academy is a federal service academy that trains students to serve as commercial merchant marine officers and as commissioned officers in the United States Armed Forces. The Academy is administered by the Maritime Administration, an organization within the Department of Transportation. Petitioner James Griffin Lane entered the Academy as a first-year student in July 1991 after meeting the Academy's requirements for appointment, including passing a physical examination conducted by the Department of Defense. During his first year at the Academy, however, Lane was diagnosed by a private physician as having diabetes mellitus. Lane reported the diagnosis to the Academy's Chief Medical Officer. The Academy's Physical Examination Review Board conducted a hearing in September 1992 to determine Lane's "medical suitability" to continue at the Academy, following which the Board reported to the Superintendent of the Academy that Lane suffered from insulin-dependent diabetes.

In December 1992, Lane was separated from the Academy on the ground that his diabetes was a "disqualifying condition," rendering him ineligible to be commissioned for service in the Navy/Merchant Marine Reserve Program or as a Naval Reserve Officer. After unsuccessfully challenging his separation before the Maritime Administrator, Lane brought

suit in Federal District Court against the Secretary of the Department of Transportation and other defendants, alleging that his separation from the Academy violated § 504(a) of the Rehabilitation Act, 29 U. S. C. § 794(a). He sought reinstatement to the Academy, compensatory damages, attorney's fees, and costs.

The District Court granted summary judgment in favor of Lane, concluding that his separation from the Academy solely on the basis of his diabetes violated the Act. The court ordered Lane reinstated to the Academy, and the Government did not dispute the propriety of this injunctive relief. The Government did, however, dispute the propriety of a compensatory damages award, claiming that the United States was protected against a damages suit by the doctrine of sovereign immunity. The District Court disagreed; it ruled that Lane was entitled to a compensatory damages award against the Government for its violation of § 504(a), but deferred resolution of the specific amount of damages due. 867 F. Supp. 1050 (DC 1994).

Shortly thereafter, however, the Court of Appeals for the District of Columbia Circuit ruled in *Dorsey* v. *United States Dept. of Labor*, 41 F. 3d 1551 (1994), that the Act did not waive the Federal Government's sovereign immunity against monetary damages for violations of § 504(a). The court denied compensatory damages based on the absence, in any statutory text, of an "unequivocal expression" of congressional intent to waive the Government's immunity as to monetary damages, and this Court's instruction that waivers of sovereign immunity may not be implied, see, *e. g.*, *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 95 (1990).

In light of *Dorsey*, the District Court vacated its prior order to the extent that it awarded damages to Lane and held that Lane was not entitled to a compensatory damages award against the Federal Government. App. to Pet. for Cert. 5a–6a. Lane appealed. The Court of Appeals for the District of Columbia Circuit first rejected Lane's request for initial en banc review to reconsider *Dorsey*, then granted the

Government's motion for summary affirmance. App. to Pet. for Cert. 1a. We granted certiorari, 516 U. S. 1036 (1996), to resolve the disagreement in the Courts of Appeals on the important question whether Congress has waived the Federal Government's immunity against monetary damages awards for violations of § 504(a) of the Rehabilitation Act. Compare, *e. g., Dorsey, supra,* at 1554–1555, with *J. L.* v. *Social Security Admin.,* 971 F. 2d 260 (CA9 1992), and *Doe* v. *Attorney General,* 941 F. 2d 780 (CA9 1991).

## II

Section 504(a) of the Act provides that

"[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U. S. C. § 794(a).

Section 505(a)(2) of the Act describes the remedies available for a violation of § 504(a): "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [§ 504]." § 794a(a)(2). Because Title VI provides for monetary damages awards, see *Franklin* v. *Gwinnett County Public Schools,* 503 U. S. 60, 70 (1992) (noting that "a clear majority" of the Court confirmed in *Guardians Assn.* v. *Civil Serv. Comm'n of New York City,* 463 U. S. 582 (1983), that damages are available under Title VI for intentional violations thereof), Lane reads §§ 504(a) and 505(a)(2) together to establish a waiver of the Federal Government's sovereign immunity against monetary damages awards for violations of § 504(a) committed by Executive agencies.

While Lane's analysis has superficial appeal, it overlooks one critical requirement firmly grounded in our precedents: A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, see, *e. g.*, *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 33–34, 37 (1992), and will not be implied, *Irwin* v. *Department of Veterans Affairs, supra*, at 95. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign. See, *e. g.*, *United States* v. *Williams*, 514 U. S. 527, 531 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"); *Library of Congress* v. *Shaw*, 478 U. S. 310, 318 (1986); *Lehman* v. *Nakshian*, 453 U. S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied"). To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims. *Nordic Village*, 503 U. S., at 34. A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; "the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text." *Id.*, at 37.

The clarity of expression necessary to establish a waiver of the Government's sovereign immunity against monetary damages for violations of § 504 is lacking in the text of the relevant provisions. The language of § 505(a)(2), the remedies provision, is telling. In that section, Congress decreed that the remedies available for violations of Title VI would be similarly available for violations of § 504(a) "by any recipient of Federal assistance or Federal provider of such assistance." 29 U. S. C. § 794a(a)(2). This provision makes no mention whatsoever of "program[s] or activit[ies] conducted by any Executive agency," the plainly more far-reaching

language Congress employed in §504(a) itself. Whatever might be said about the somewhat curious structure of the liability and remedy provisions, it cannot be disputed that a reference to "Federal provider[s]" of financial assistance in §505(a)(2) does not, without more, establish that Congress has waived the Federal Government's immunity against monetary damages awards beyond the narrow category of §504(a) violations committed by federal funding agencies acting as such—that is, by "Federal provider[s]."

The lack of clarity in §505(a)(2)'s "Federal provider" provision is underscored by the precision with which Congress has waived the Federal Government's sovereign immunity from compensatory damages claims for violations of §501 of the Rehabilitation Act, 29 U. S. C. §791, which prohibits discrimination on the basis of disability in employment decisions by the Federal Government. In §505(a)(1), Congress expressly waived the Federal Government's sovereign immunity against certain remedies for violations of §501:

> "The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 [which allows monetary damages] . . . shall be available, with respect to any complaint under section 501 of this Act, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." 29 U. S. C. §794a(a)(1).

Section 505(a)(1)'s broad language—"any complaint under section 501"—suggests by comparison with §505(a)(2) that Congress did not intend to treat all §504(a) defendants alike with regard to remedies. Had Congress wished to make Title VI remedies available broadly for *all* §504(a) violations, it could easily have used language in §505(a)(2) that is as sweeping as the "any complaint" language contained in §505(a)(1).

But our analysis need not end there. In the Civil Rights Act of 1991, Congress made perfectly plain that compensatory damages would be available for certain violations of § 501 by the Federal Government (as well as other § 501 defendants), subject to express limitations:

> "In an action brought by a complaining party under the powers, remedies, and procedures set forth in . . . section 794a(a)(1) of title 29 [which applies to violations of § 501 by the Federal Government] . . . against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of title 29 and the regulations implementing section 791 of title 29, or who violated the requirements of section 791 of title 29 or the regulations implementing section 791 of title 29 concerning the provision of a reasonable accommodation, . . . the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section . . . from the respondent." Rev. Stat. § 1977A, as added, 105 Stat. 1072, 42 U. S. C. § 1981a(a)(2).

The Act's attorney's fee provision makes a similar point. Section 505(b) provides that, "[i]n any action or proceeding to enforce or charge a violation of a provision of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U. S. C. § 794a(b). This provision likewise illustrates Congress' ability to craft a clear waiver of the Federal Government's sovereign immunity against particular remedies for violations of the Act. The clarity of these provisions is in sharp contrast to the waiver Lane seeks to tease out of §§ 504 and 505(a)(2) of the Act.

Lane insists nonetheless that § 505(a)(2) compels a result in his favor, arguing that the Department of Transportation is a "Federal provider" within the meaning of § 505(a)(2) and thus is liable for a compensatory damages award regardless

of our resolution of the broader sovereign immunity question. Reply Brief for Petitioner 8–9. We disagree. The Department of Transportation, whatever its other activities, is not a "Federal provider" of financial assistance *with respect to the Merchant Marine Academy*, which the Department itself administers through the Maritime Administration. At oral argument, Lane's counsel effectively conceded as much. See Tr. of Oral Arg. 7 (acknowledging that the Department of Transportation is not a federal provider with respect to the Academy "because of this Court's decision in [*Department of Transp.* v. *Paralyzed Veterans of America*, 477 U. S. 597, 612 (1986)], which indicates that funds that are actually provided to an entity that the Federal Government manages itself, which is what DOT does here . . . for the Merchant Marine Academy," do not render the agency a "Federal provider"). Lane argues that § 505(a)(2)'s reference to "Federal provider[s]" is not limited by the text of the provision itself to the *funding activities* of those providers, but instead reaches "any act" of an agency that serves as a "Federal provider" in any context. Reply Brief for Petitioner 9, and n. 11. In light of our established practice of construing waivers of sovereign immunity narrowly in favor of the sovereign, however, we decline Lane's invitation to read the statutory language so broadly.

Lane next encourages us to look not only at the language of the liability and remedies provisions but at the larger statutory scheme, from which he would discern congressional intent to "level the playing field" by subjecting the Federal Government to the same remedies as any and all other § 504(a) defendants. A statutory scheme that would subject the Federal Government to awards of injunctive relief, attorney's fees, and monetary damages when it acts as a "Federal provider," but would not subject it to monetary damages awards when, and only when, a federal Executive agency itself commits a violation of § 504(a), Lane posits, is so illogi-

cal as to foreclose the conclusion that Congress intended to create such a scheme.

The statutory scheme on which Lane hinges his argument is admittedly somewhat bewildering. But the lack of perfect correlation in the various provisions does not indicate, as Lane suggests, that the reading proposed by the Government is entirely irrational. It is plain that Congress is free to waive the Federal Government's sovereign immunity against liability without waiving its immunity from monetary damages awards. The Administrative Procedure Act (APA) illustrates this nicely. Under the provisions of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," is expressly authorized to bring "[a]n action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U. S. C. § 702 (emphasis added).

In any event, Lane's "equal treatment" argument largely misses the crucial point that, when it comes to an award of money damages, sovereign immunity places the Federal Government on an entirely different footing than private parties. Petitioner's reliance on *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), then, is misplaced. In *Franklin*, we held only that the implied private right of action under Title IX of the Education Amendments of 1972 supports a claim for monetary damages. "[A]bsent clear direction to the contrary by Congress," we stated, "the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.*, at 70–71. *Franklin*, however, involved an action against nonfederal defendants under Title IX. Although the Government does not contest the propriety of the injunctive relief Lane obtained, the Federal Government's sovereign immunity prohibits wholesale application of *Franklin* to ac-

tions against the Government to enforce § 504(a).  As the Government puts it, "[w]here a cause of action is authorized against the federal government, the available remedies are not those that are 'appropriate,' but only those for which sovereign immunity has been expressly waived."  Brief for Respondents 28.

And Lane's "equal treatment" argument falters as well on a point previously discussed: Section 505(a)(2) itself indicates congressional intent to treat federal Executive agencies *differently* from other § 504(a) defendants for purposes of remedies.  See *supra*, at 192–193.  The existence of the § 505(a)(2) remedies provision brings this case outside the "general rule" we discussed in *Franklin:* This is not a case in which "a right of action exists to enforce a federal right and Congress is silent on the question of remedies."  503 U. S., at 69.  Title IX, the statute at issue in *Franklin,* made no mention of available remedies.  *Id.,* at 71.  The Rehabilitation Act, by sharp contrast, contains a provision labeled "Remedies and attorney fees," § 505.  Congress has thus spoken to the question of remedies in § 505(a)(2), the only "remedies" provision directly addressed to § 504 violations, and has done so in a way that suggests that it did not in fact intend to waive the Federal Government's sovereign immunity against monetary damages awards for Executive agencies' violations of § 504(a).  Given the existence of a statutory provision that is directed precisely to the remedies available for violations of § 504, it would be a curious application of our sovereign immunity jurisprudence to conclude, as the dissent appears to do, see *post,* at 209–210, that the lack of clear reference to Executive agencies in any express remedies provision indicates congressional intent to subject the Federal Government to monetary damages.

## III

Even if §§ 504(a) and 505(a)(2) together do not establish the requisite unequivocal waiver of immunity, Lane insists, the "equalization" provision contained in § 1003 of the Reha-

bilitation Act Amendments of 1986, 100 Stat. 1845, 42 U. S. C. § 2000d–7, reveals congressional intent to equalize the remedies available against all defendants for § 504(a) violations. Section 1003 was enacted in response to our decision in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985), where we held that Congress had not unmistakably expressed its intent to abrogate the States' Eleventh Amendment immunity in the Rehabilitation Act, and that the States accordingly were not "subject to suit in federal court by litigants seeking retroactive monetary relief under § 504." *Id.*, at 235. By enacting § 1003, Congress sought to provide the sort of unequivocal waiver that our precedents demand. That section provides:

> "(1) A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

> "(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U. S. C. § 2000d–7(a).

The "public entities" to which § 1003 refers, Lane concludes, must include the federal Executive agencies named in § 504(a), and those agencies must be subject to the same remedies under § 504(a), including monetary damages, as are private entities.

Although Lane's argument is not without some force, § 1003 ultimately cannot bear the weight Lane would assign

it. The equalization provision is susceptible of at least two interpretations other than the across-the-board leveling of liability and remedies that Lane proposes. Under the first such interpretation, as proposed by the Government, the "public . . . entit[ies]" to which the statute refers are "the non-federal public entities receiving federal financial assistance that are covered by" each of the statutes to which § 1003(a)(1) refers: The Rehabilitation Act, Title VI, Title IX, and the Age Discrimination Act of 1975. Brief for Respondents 22. The Government's suggestion is a plausible one: that § 1003(a)(2) refers to municipal hospitals, local school districts, and the like, which are unquestionably subject to *each* of the Acts listed in § 1003(a)(1). Section 504 alone among the listed Acts, however, extends its coverage to "program[s] or activit[ies] conducted by any Executive agency."

Section 1003 is also open to a second interpretation, one similar to the "leveling" interpretation suggested by petitioner: By reference to "public or private entit[ies]," Congress meant only to subject the States to the scope of remedies available against *either* public or private § 504 defendants, whatever the lesser (or perhaps the greater) of those remedies might be. Lane's reading of the statute— one that would suggest that *all* § 504(a) defendants, including the States, are subject to precisely the same remedies for violations of that provision—would effectively read out of the statute the very language on which he seeks to rely. That is, if the same remedies are available against all governmental and nongovernmental defendants under § 504(a), the "public or private" language is entirely superfluous. Congress could have achieved the result Lane suggests simply by subjecting States to the same remedies available against "every other entity," without further elaboration. The fact that § 1003(a)(2) itself separately mentions public and private entities suggests that there is a distinction to be made in

terms of the remedies available against the two classes of defendants.

Although neither of these conceivable readings of § 1003(a)(2) is entirely satisfactory, their existence points up a fact fatal to Lane's argument: Section 1003(a) is not so free from ambiguity that we can comfortably conclude, based thereon, that Congress intended to subject the Federal Government to awards of monetary damages for violations of § 504(a) of the Act. Given the care with which Congress responded to our decision in *Atascadero* by crafting an unambiguous waiver of the States' Eleventh Amendment immunity in § 1003, it would be ironic indeed to conclude that that same provision "unequivocally" establishes a waiver of the Federal Government's sovereign immunity against monetary damages awards by means of an admittedly ambiguous reference to "public . . . entit[ies]" in the remedies provision attached to the unambiguous waiver of the States' sovereign immunity.

For the reasons stated, the judgment of the Court of Appeals for the District of Columbia Circuit is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BREYER joins, dissenting.

The Court relies on an amalgam of judge-made rules to defeat the clear intent of Congress to authorize an award of damages against a federal Executive agency that violates § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794. To reach this unfortunate result, the majority ignores the Act's purpose, text, and legislative history, relying instead on an interpretation of the structure of §§ 504 and 505 that the Court admits is "curious," *ante,* at 193, and "somewhat bewildering," *ante,* at 196.

The relevant facts are undisputed. The Department of Transportation violated § 504 by separating petitioner Lane

from the Merchant Marine Academy because he has diabetes. Lane was injured by that violation, and he is therefore entitled to maintain an action against the agency under § 504. The parties and the Court agree that damages are an appropriate form of relief for most violations of § 504, including wrongful conduct by private recipients of federal funding, by state actors, and by federal agencies acting in a funding capacity. The only issue in the case is whether Congress carved out a special immunity from damages liability for federal agencies acting in a nonfunding capacity, as the Department of Transportation was acting in this instance. I think it plain that Congress did not.

## I

Congress passed the Rehabilitation Act to "develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living" for the disabled. 29 U. S. C. § 701, as amended by Pub. L. 95–602, Title I, § 122(a)(1), 92 Stat. 2984. As originally enacted in 1973, § 504 of the Act provided:

> "No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Pub. L. 93–112, 87 Stat. 394.

Although the Court pays scant attention to the principle, we have previously held that congressional intent with respect to a statutory provision must be interpreted in the light of the contemporary legal context. *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 71 (1992). A review of the relevant authorities convinces me that § 504 created a private cause of action with a damages remedy.

The text of § 504 was modeled on the language of § 601 of Title VI of the Civil Rights Act of 1964, which prohibits

discrimination by any recipient of federal funds on the basis of race, color, or national origin.[1] Following passage of Title VI, federal courts unanimously held that § 601 created a private cause of action. See *Cannon* v. *University of Chicago,* 441 U. S. 677, 696 (1979). Although we have never expressly ruled on the question, our opinion in *Cannon* implicitly ratified that judgment. *Id.,* at 703.

Our explicit holding in *Cannon* was that Title IX of the Education Amendments of 1972, which was also patterned on Title VI, created a private cause of action.[2] This conclusion stemmed, in part, from our understanding that Congress meant Title IX to be interpreted and applied in the same manner as Title VI. *Id.,* at 696. We presumed, consistent with well-established principles of statutory interpretation, that Congress was aware of the relevant legal context when it passed Title IX. *Id.,* at 696–697. We also noted that between the enactment of Title VI in 1964 and the enactment of Title IX in 1972 we had consistently found implied remedies in less clear statutory text. *Id.,* at 698.

Congress passed § 504 in 1973, just one year after enacting Title IX. Relying on analysis like that set forth in *Cannon,* the Courts of Appeals have uniformly held that Congress intended § 504 to provide a private right of action for victims of prohibited discrimination.[3]

---

[1] The precise language of § 601 is as follows: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d.

[2] Section 901 of Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 86 Stat. 373, as amended, 20 U. S. C. § 1681(a).

[3] See, *e. g., Kampmeier* v. *Nyquist,* 553 F. 2d 296, 299 (CA2 1977); *NAACP* v. *Medical Center, Inc.,* 599 F. 2d 1247, 1258–1259 (CA3 1979); *Pandazides* v. *Virginia Bd. of Ed.,* 13 F. 3d 823 (CA4 1994); *Camenisch* v. *University of Texas,* 616 F. 2d 127, 130–131 (CA5 1980), vacated on other

In my opinion the Courts of Appeals are undoubtedly correct.[4]

Our decision in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), makes it equally clear that all traditional forms of relief, including damages, are available in a private action to enforce § 504. In *Franklin* we held that a plaintiff could seek monetary damages against a school system accused of violating her rights under Title IX. We canvassed the long history of the principle that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood*, 327 U. S. 678, 684 (1946). See *Franklin*, 503 U. S., at 65–71. Applying this rule to the implied cause of action in Title IX, we rejected the government's contention that "whatever the traditional presumption may have been when the Court decided *Bell* v. *Hood*, it has disappeared in succeeding decades." *Id.*, at 68. From *Franklin* it follows ineluctably that the original version of § 504—enacted, it bears repeating, one year after Title IX—authorized a damages remedy for persons aggrieved by violations of the provision's discrimination ban.

## II

Against this background, Congress passed legislation in 1978 to extend § 504's prohibition against discrimination on

---

grounds, 451 U. S. 390 (1981); *Jennings* v. *Alexander*, 715 F. 2d 1036, 1040–1041 (CA6 1983), rev'd on other grounds *sub nom. Alexander* v. *Choate*, 469 U. S. 287 (1985); *Lloyd* v. *Regional Transp. Auth.*, 548 F. 2d 1277, 1284–1287 (CA7 1977); *Miener* v. *Missouri*, 673 F. 2d 969, 973–974 (CA8), cert. denied, 459 U. S. 909 (1982); *Kling* v. *County of Los Angeles*, 633 F. 2d 876, 878 (CA9 1980), rev'd on other grounds, 474 U. S. 936 (1985); *Pushkin* v. *Regents of the Univ. of Colo.*, 658 F. 2d 1372, 1376–1380 (CA10 1981); *Jones* v. *Metropolitan Atlanta Rapid Transit Auth.*, 681 F. 2d 1376, 1377, n. 1 (CA11 1982), cert. denied, 465 U. S. 1099 (1984).

[4] See Conference Report on the Rehabilitation Act Amendments of 1974, S. Rep. No. 93–1270, p. 27 (1974) (hereinafter Conference Report on 1974 Amendments) (noting that § 504 was intended to "permit a judicial remedy through a private action").

the basis of handicap to cover the actions of federal Executive agencies. The amendment was part of a lengthy piece of legislation intended to strengthen the protections embodied in the original Act. See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. 95–602, 92 Stat. 2955 (statement of purpose). The legislation evidenced Congress' continued commitment to the broad goals of the earlier Act by, for example, adding provisions aimed at improving accountability and enforcement, see, *e. g.*, Pub. L. 95–602, Title I, §§ 122(a)(10), 106, 109(4), 29 U. S. C. §§ 711–715, 751, 761b; expanding federal support for research programs, see, *e. g.*, Pub. L. 95–602, Title I, §§ 109(4), 104(c)(1), 29 U. S. C. §§ 761a, 762a; augmenting funding for projects such as job training and the removal of physical barriers in public places, see, *e. g.*, Pub. L. 95–602, Title I, §§ 116(2), 120(a), 29 U. S. C. § 777 *et seq.*, § 794b; and creating local rehabilitation centers across the Nation, see Pub. L. 95–602, Title I, § 115(a), 29 U. S. C. § 775. Together, the amendments represented a substantial financial investment in the future of the disabled in this country.

As part of this general expansion of the original Act, Congress amended § 504 to forbid discrimination against the handicapped "under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."[5]  29 U. S. C. § 794(a). The question we ad-

---

[5] Section 504 was amended: "by striking out the period at the end thereof and inserting in lieu thereof 'or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.'" 92 Stat. 2982.

dress here is whether this unambiguous extension of § 504 to federal agencies was meant to waive the Government's sovereign immunity to damages liability. The answer is surely "yes." Section 504 as originally enacted was understood to create a private right of action for aggrieved individuals and to authorize a damages remedy. Congress, acting in 1978, had no reason to expect the courts to require a clearer statement respecting the remedies available against a federal defendant than those available against any other § 504 defendant. And the text of the amendment—which simply inserted the phrase extending coverage to federal agencies into the existing sentence prohibiting discrimination by federal grantees—gives no indication whatsoever that Congress intended to create a different remedial scheme for the agencies.

The Court rejects this conclusion, however, because it reads another part of the 1978 amendment, § 505(a)(2), as a limitation on the remedies available against Executive agencies under § 504. In my judgment, the Court errs by misinterpreting the language and structure of § 505 and ignoring its legislative history.

Congress' intent to strengthen the Act's protections is clearly evident in § 505. The inclusion of an attorney's fees provision in § 505(b) fortified the Act's enforcement mechanisms. This assistance to plaintiffs was necessary, according to the Senate Report accompanying the amendments, because "the rights extended to handicapped individuals under title V . . . are, and will remain, in need of constant vigilance by handicapped individuals to assure compliance . . . ." S. Rep. No. 95–890, p. 19 (1978).[6]

The remedies provision, § 505(a), was also meant to ensure compliance with the 1973 Act, not to restrict remedies that Congress had made available under § 504, as the majority

---

[6] Section 505 originated in the Senate.

would have it. The section's legislative history demonstrates Congress' intent.

Between the enactment of § 504 in 1973 and the passage of § 505(a)(2) in 1978,[7] the Department of Health, Education, and Welfare promulgated model regulations for federal agencies to use in implementing the antidiscrimination principle announced in § 504. See 43 Fed. Reg. 2132 (1978).[8] Because of the common understanding that § 504 was patterned on § 601 of Title VI, 42 U. S. C. § 2000d, and intended to be enforced in the same manner,[9] the Department simply directed the agencies to follow the procedures they used to enforce Title VI. See 43 Fed. Reg. 2137, § 85.5 (1978). This directive resulted in uniform enforcement mechanisms for allegations of discrimination by federal grantees on the basis of handicap, race, color, or national origin.[10] Moreover, it avoided needless duplication of effort. Section 601 is accompanied by additional provisions explaining Congress' in-

---

[7] The full text of § 505(a)(2) reads as follows: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act." 29 U. S. C. § 794a(a)(2).

[8] The Department acted pursuant to a directive from President Ford. See Exec. Order No. 11914, "Nondiscrimination With Respect to the Handicapped in Federally Assisted Programs," issued on April 28, 1976; 41 Fed. Reg. 17871. Congress had encouraged the President to take this step. See Conference Report on 1974 Amendments, at 28 ("The Secretary of the Department of Health, Education, and Welfare, because of that Department's experience in dealing with handicapped persons and with the elimination of discrimination in other areas, should assume responsibility for coordinating the section 504 enforcement effort . . . . The conferees . . . urge . . . delegation of responsibility to the Secretary [through an Executive Order]").

[9] See id., at 27 (the "language of section 504, in following [Title VI and Title IX], . . . envisions the implementation of a compliance program which is similar to those Acts").

[10] Congress plainly intended this result. See ibid. ("This approach to implementation of section 504 . . . would . . . provide for administrative due process").

tentions with respect to implementation of the provision's mandate. See 42 U. S. C. § 2000d–1 *et seq.* As originally enacted, § 504 stood alone. It therefore made sense to allow federal agencies to take advantage of the details included in Title VI and the regulations promulgated to enforce § 601.

In enacting § 505(a)(2), Congress explicitly recognized and approved the application of Title VI's enforcement procedures to § 504. Thus, despite the Court's narrow focus on the incorporation of the remedies provided by Title VI, § 505(a)(2) provides that the "remedies, *procedures, and rights*" set forth in Title VI are available to an individual aggrieved by the conduct of a federal grant recipient. 29 U. S. C. § 794a(a)(2) (emphasis added). As the Senate Report explained:

> "It is the committee's understanding that the regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under section 504 conform with those promulgated under title VI. Thus, this amendment codifies existing practice as a specific statutory requirement." S. Rep. No. 95–890, at 19.

Viewed in this context, the reference in § 505(a)(2) to "Federal provider[s]" that the Court finds so puzzling is easily understood: The compliance mechanisms defined in Title VI include remedies, procedures, and rights applicable to the providers of federal financial assistance as well as to the recipients of such assistance. See 29 U. S. C. § 2000d–1 *et seq.;* see, *e. g.,* 34 CFR §§ 100.6–100.10 (1995) and Part 101 (Department of Education regulations implementing Title VI); 45 CFR §§ 80.6–80.10 (1995) and Part 81 (same for Department of Health and Human Services); *id.,* §§ 611.6–611.10 (same for National Science Foundation).

Section 505(a)(1), the analogous provision for violations of § 501's prohibition on handicap discrimination in federal

employment, has a similar history.[11]    The provision was intended to "aid in attaining" the goals of § 501 "by providing for individuals aggrieved on the basis of their handicap the same rights, procedures, and remedies provided [to] individuals aggrieved on the basis of race, creed, color, or national origin."    S. Rep. No. 95–890, at 18–19.    Like § 504, § 501 is not accompanied by any provisions concerning implementation.    Section 505(a)(1) directs the executive to look to Title VII for appropriate "remedies, *procedures, and rights.*"    29 U. S. C. § 794a(a)(1) (emphasis added).

Unlike § 501 and the clause of § 504 relating to recipients of federal financial assistance, the prohibition on handicap discrimination in programs or activities conducted by federal Executive agencies had no simple statutory analogue.    The Court opines that if "Congress [had] wished to make Title VI remedies available broadly for *all* § 504(a) violations, it could easily have used language in § 505(a)(2) that is as sweeping as the 'any complaint' language contained in § 505(a)(1)."    *Ante*, at 193.    I agree.    Congress did not so intend, however, because, in the words of the United States, "[i]t would have been odd for Congress to have provided that Title VI remedies applied in Section 504 cases involving discrimination by executive agencies because Title VI [unlike § 504] does not prohibit discrimination in programs or activi-

---

[11] Section 505(a)(1) provides: "The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U. S. C. § 2000e–16), including the application of sections 706(f) through 706(k) (42 U. S. C. § 2000e–5(f) through (k)), shall be available, with respect to any complaint under section 501 of this Act, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint.    In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy."    29 U. S. C. § 794a(a)(1).

ties conducted by executive agencies," Brief for Respondents 16, n. 8.

The oddity extends beyond the nomenclature used to describe § 504 defendants. There are at least two substantive differences between federal Executive agencies and federal grantees as defendants under the provision. First, Title VI provides remedies that are appropriate against recipients of federal financial assistance, such as the withdrawal of funding for continuing violations, see 42 U. S. C. § 2000d–1, but that make no sense if applied against an agency defendant. Second, some violations that an agency might commit concern discrimination more closely analogous to statutory provisions outside of Title VI. Thus, the standard enforcement procedures adopted for alleged violations of § 504 involving *employment* discrimination by federal agencies require the agency to follow *§ 501* enforcement procedures. See, e. g., 7 CFR § 15e.170(b) (1995) (Department of Agriculture regulations implementing § 504's mandate to federal agencies); 15 CFR § 8c.70 (1995) (same for Department of Commerce); 45 CFR § 85.61 (1995) (same for Department of Health and Human Services).

Viewed in its historical context, § 505(a)(2) simply has no application to violations of § 504 committed by federal agencies acting in a nonfunding capacity. Section 505(a)(2) delineates the remedies, procedures, and rights available to persons aggrieved by the conduct of federal grantees and federal funding agencies. It is silent on the remedies, procedures and rights available for transgressions of § 504 by federal Executive agencies acting in a nonfunding capacity. The relief to which petitioner is entitled is rooted in § 504 itself.

In my opinion, § 504 is amply sufficient to meet petitioner's needs. By failing to dictate explicitly the remedies available against federal agencies, Congress left in place the remedies that accompany § 504's implied cause of action. As Congress understood in both 1973 and 1978, these remedies

include monetary damages.[12] Thus, as of 1978, the Rehabilitation Act provided the relief sought by petitioner in this case.

Under the Court's current jurisprudence, however, § 504 apparently must be read in a vacuum. Since the advent of *United States* v. *Nordic Village, Inc.*, 503 U. S. 30 (1992), the Court not only requires the traditional clear statement of a waiver of sovereign immunity but steadfastly refuses to consider the legislative history of a statute, no matter how opaque the statutory language or crystalline the history.[13] I shall not review my objections to that holding here. See *id.*, at 39–46 (dissenting opinion). Suffice it to say that Congress had no reason to suspect in 1978 that 14 years later this Court would adopt (and apply retroactively) a radically new and unforgiving approach to waivers of sovereign immunity.

## III

Not surprisingly, given its lack of fidelity to the statutory text and history, the Court's reasoning leads to two implausible conclusions. To credit the Court's analysis, one must believe that Congress intended a damages remedy against a federal Executive agency acting indirectly in the provision

---

[12] Aware that procedures were also needed, Congress added language in § 504 directing federal agencies to promulgate appropriate procedures. 29 U. S. C. § 794(a) ("The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978").

[13] The Court distinguishes *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), on the ground that *Franklin* involved a nonfederal defendant whereas this case concerns a federal defendant. *Ante*, at 196–197. This argument cannot be reconciled with the reasoning of our opinion. *Franklin* relied on cases in which pecuniary awards against the United States had been upheld. See 503 U. S., at 67 (citing *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524 (1838), and *Dooley* v. *United States*, 182 U. S. 222 (1901)). That being so, there is no basis for restricting application of the rule to the facts of that case.

of funding to nonfederal entities, but not against an agency acting directly in the conduct of its own programs and activities.[14]  Surely such an unexpected result would have merited comment in a committee report or on the floor of the House or Senate.   Yet there is not a scintilla of evidence in the purpose or legislative history of the Rehabilitation Act or its amendments supporting this interpretation of the statute.

In addition, the majority's holding necessarily presumes that Congress intended to impose harsher remedies on the States (which come under the § 504 provision prohibiting handicap discrimination by federal grantees) than on federal agencies for comparable misconduct.   Given the special respect owed to the States—a respect that provided the *ratio decidendi* for our decision in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985)—this suggestion is wholly unconvincing.   And once again, the legislative history of the Rehabilitation Act contains no mention of such an intent and no hint of a policy justification for this distinction.

The Court's strict approach to statutory waivers of sovereign immunity leads it to concentrate so carefully on textual details that it has lost sight of the primary purpose of judicial construction of Acts of Congress.   We appropriately rely on canons of construction as tie breakers to help us discern Congress' intent when its message is not entirely clear.   The presumption against waivers of sovereign immunity serves that neutral purpose in doubtful cases.   A rule that refuses to honor such a waiver because it could have been expressed with even greater clarity, or a rule that refuses to accept guidance from relevant and reliable legislative history, does not facilitate—indeed, actually obstructs—the neutral performance of the Court's task of carrying out the will of Congress.

---

[14] Even under the majority's interpretation, "Federal provider" must refer exclusively to Executive agencies.   Otherwise § 505(a)(2) would create remedies against entities that may not be held liable under § 504.

The prompt congressional reaction to our decision in *Atascadero* illustrates the lack of wisdom of the Court's rigid approach to waivers of sovereign immunity.[15]   It was true in that case, as it is in this, that Congress could have drafted a clearer statement of its intent.   Our task, however, is not to educate busy legislators in the niceties and details of scholarly draftsmanship, but rather to do our best to determine what message they intended to convey.   When judge-made rules require Congress to use its valuable time enacting and reenacting provisions whose original intent was clear to all but the most skeptical and hostile reader, those rules should be discarded.

I respectfully dissent.

---

[15] The Court decided *Atascadero* in 1985.   Congress passed legislation to override the decision in 1986.   See Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U. S. C. § 2000d–7; see also *ante*, at 198.   In recent years Congress has enacted numerous pieces of legislation designed to override statutory opinions of this Court.   See *Landgraf* v. *USI Film Products*, 511 U. S. 244, 250–251 (1994) (listing eight decisions legislatively overruled by the Civil Rights Act of 1991).   Additional examples are cited in Eskridge, Overriding Supreme Court Statutory Interpretation Decisions, 101 Yale L. J. 331, App. I (1991).