# United States Court of Appeals
## For the First Circuit

No. 04-1909

MARINA BAY REALTY TRUST LLC; NEPONSET CIRCLE
SKILLED NURSING AND REHABILITATION CENTER II, INC.;
GORDON DEVELOPMENT GROUP, INC.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA; U.S. DEPT. OF DEFENSE;
U.S. DEPARTMENT OF THE NAVY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lipez, Circuit Judge,
Stahl, Senior Circuit Judge,
and Oberdorfer, Senior District Judge.[*]

William A. DeVasher, Jr., with whom Michael B. Cosentino,
Molly Cochran, and Seegel, Lipshutz & Wilchins, P.C., were on
brief, for appellants.
David C. Shilton, Attorney, Appellate Section, with whom
Thomas L. Sansonetti, Assistant Attorney General, Andrew Doyle,
Attorney, Environmental Defense Section, and John Stahr, Attorney,
Appellate Section, U.S. Department of Justice, Environment &
Natural Resources Division, were on brief, for appellees.
Theodore L. Hunt, Attorney, with whom Peter D. Keisler,
Assistant Attorney General, J. Patrick Glynn, Director, Joann J.

[*]Of the District of Columbia, sitting by designation.

Bordeaux, Deputy Director, David S. Fishback, Assistant Director, and Henry T. Miller, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Torts Branch, Environmental Torts Section, were on brief, for appellees.

—————————————

May 3, 2005

—————————————

**STAHL, <u>Senior Circuit Judge</u>.**  This case asks us to decide whether the United States has waived its sovereign immunity for a suit by a private owner to recover monetary damages for its cleanup of past oil contamination on property that was formerly a United States Navy base.  Finding that the United States has not waived its sovereign immunity, we affirm.

## I.  BACKGROUND

In 1917, the Defendant-Appellee United States[1] acquired 600-plus acres of land located in Quincy, Massachusetts, including the subject of this litigation, a 3.8 acre parcel of land referred to by the parties as "Lot 50."  From 1917 to 1953, the United States used the 600-plus acre parcel, including Lot 50, for various defense purposes, including as a Naval air station.  In conjunction with the property's operation, the United States government made various improvements to the property, including construction of an airplane hangar, an airplane parking lot, and the installation of a 3,000 gallon underground storage tank to hold fuel oil for the hangar heating system.[2]

---

[1]This action was brought against the United States of America, the United States Department of Defense, and the United States Department of the Navy, which we collectively refer to as the "United States."

[2]A 1948 plan and diagram of the airplane hangar shows that a second, smaller underground storage tank was located near the newly-installed 3,000 gallon underground storage tank.  It is unclear when the smaller underground storage tank was installed. The contamination in this case stems only from the corrosion of the 3,000 gallon tank.

In 1954, the Navy deactivated and closed the base, and subsequently offered the property for sale. On December 5, 1956, the 600-plus acre parcel, including Lot 50, was transferred to Boston Edison Company by deed "without any covenants or warranties whatsoever, either express or implied." During Boston Edison's ownership of the property, the airplane hangar was removed, and approximately two to three feet of fill was placed on Lot 50, covering the hangar's concrete foundation and the surrounding asphalt airplane parking area.

At some time in 1997, Peter Gordon, looking for a potential site for the construction of a nursing home, began negotiating for the purchase of a twelve-acre parcel that included Lot 50.[3] As part of a due diligence inspection, an environmental site assessment of the property was prepared. Because of the property's prior use, the site assessment noted that there could be

---

[3]Gordon owns and controls all Plaintiff-Appellant entities (collectively "Plaintiffs" or "Appellants") in this action. Appellant Marina Bay Realty Trust LLC ("Marina Bay") is a property holding company that was formed to acquire the twelve-acre parcel (including Lot 50). Appellant Neponset Circle Skilled Nursing and Rehabilitation Center II, LLC ("Neponset") was formed to operate the nursing homes owned by the Gordon entities. Appellant Gordon Development Group, Inc. ("Gordon Development") was formed to supervise and oversee the construction of a nursing home on Lot 50 after Lot 50 was sold and transferred to Alliance Health of Brockton, Inc. ("Alliance"). Alliance is not a party to this action and is not related or affiliated with the Appellant entities. At times, we refer to actions being taken by "Gordon," although we do not imply that Gordon was acting at any time in his personal capacity, but at all times in his professional capacity on behalf of one of his various entities.

underground storage tanks on the property, and advised that a geophysical survey be conducted to determine whether any underground storage tanks were present. Gordon decided not to further investigate the matter, and Marina Bay Development Group, LLC ("MBDG"), a Gordon entity not a party to this appeal, purchased the twelve-acre parcel on October 30, 1997, pursuant to a quitclaim deed which provided that the property was being transferred: "AS IS, WHERE IS, and WITH ALL FAULTS."[4]

MBDG then subdivided the twelve-acre parcel into three lots (one of which is Lot 50), and, in December 1997, transferred Lot 50 to Appellant Marina Bay.[5] After the transfer, Marina Bay engaged an environmental consulting firm to conduct an environmental investigation. Their work detected elevated levels of petroleum hydrocarbons in the soil.

A second environmental consulting firm conducted further investigation, and located a corroded 3,000 gallon underground storage tank and an intact 350-plus gallon underground storage tank containing No. 2 fuel oil/diesel fuel. Marina Bay had the second firm remove the two underground tanks and excavate the contaminated

---

[4]We do not address the implications of the language contained in the deeds from the United States to Boston Edison and from Boston Edison to MBDG on the liability of the United States as that discussion is not necessary to our resolution of the appeal.

[5]The remaining two lots were sold to unrelated entities and are not involved in this appeal.

soil around the corroded tank. The clean-up of the site was completed on December 30, 1998.

During the time between the first environmental firm's detection of the contamination, and the second firm's removal of the contamination, problems arose with Marina Bay's efforts to secure financing for the construction of a nursing home on Lot 50 largely as the result of the property being located on a 100-year flood plain. Apparently frustrated with the financing problems, Gordon decided to sell Lot 50.

On September 22, 1999, Appellant Marina Bay sold Lot 50 to Alliance and, as part of the transaction, Appellant Neponset agreed to transfer to Alliance its nursing home business. Alliance also paid Marina Bay $655,748 for pre-development expenses and agreed to pay Appellant Gordon Development $500,000 to supervise and oversee the construction of a nursing home on Lot 50 for Alliance. A nursing home was then constructed on Lot 50.

On August 11, 2000, Appellants Marina Bay and Neponset brought this action against the United States in the United States District Court for the District of Massachusetts seeking recovery of approximately $310,000 in cleanup costs and $2.2 million for what it claimed to be increased construction and finance costs associated with the delay experienced as a result of the contamination discovered on the site. The Appellants raised four claims in their complaint: Counts I and II alleged that the United

States was liable for costs under Massachusetts General Laws Chapter 21E ("Chapter 21E"), Sections 5(a)(5) and 5(a)(2), implicitly claiming that the United States had waived its sovereign immunity for such liability under Section 6001(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6961(a); Count III alleged that the United States was liable for Appellants' costs under Chapter 21E, claiming that the United States had waived its sovereign immunity for such liability under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680; and Count IV alleged a common law negligence claim, implicitly asserted through the FTCA.

The United States filed a motion to dismiss, arguing that neither the RCRA nor the FTCA waived its sovereign immunity for private money damages arising from the alleged past contamination. The United States also argued that liability for the FTCA claims contained in Counts III and IV were barred by the discretionary function and misrepresentation exceptions of the FTCA.[6] On July 5, 2001, the district court granted the United States' motion in part, dismissing Counts I and II, finding that the RCRA did not waive the United States' sovereign immunity from suit for private money damages. The district court denied the United States' motion as to Counts III and IV, finding that the United States would not enjoy

---

[6]Because of our ultimate resolution of the case, we do not discuss the discretionary function and misrepresentation exceptions to the FTCA.

sovereign immunity if the Plaintiffs proved, as they alleged in their complaint, that the United States was negligent or wrongful in its contamination of Lot 50, and that the discretionary function and misrepresentation exceptions contained in the FTCA did not bar the Plaintiffs' FTCA-based claims.

At the close of discovery, the United States filed a motion for summary judgment on Plaintiffs' claims for consequential damages, that is, the claims alleging that the United States was liable for increased construction and financing costs, arguing that the Plaintiffs had not incurred any such costs.[7] The court granted the United States' motion for summary judgment just prior to the commencement of trial.

Trial then commenced on Plaintiffs' two FTCA claims, Counts III and IV, now seeking recovery only for Plaintiffs' actual clean-up costs. On the fifth day of trial, Plaintiffs rested their case-in-chief with the exception of one witness--an expert witness named Dr. Rogers--because that witness was unavailable. The United States filed a motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), arguing that the FTCA only

---

[7]In response to the United States' motion, Plaintiffs asserted that another entity, Gordon Development, had actually incurred the increased construction and financing costs, and moved to add Gordon Development as a plaintiff. The court granted Plaintiffs' motion, and the United States subsequently renewed its motion for summary judgment as to all Plaintiffs, including Gordon Development, arguing that Gordon Development could not prove that it incurred such costs.

waives sovereign immunity for negligent or wrongful conduct by a federal employee--a fact that the United States argued the Plaintiffs had failed to prove, could not prove with the testimony of Dr. Rogers, and could not establish through Chapter 21E's "causation" requirement. As a result of scheduling conflicts, the court adjourned the trial and took the government's motion under advisement. On May 27, 2004, the district court granted the United States' motion and entered judgment for the United States stating that the Plaintiffs "appear to concede that they have not proven negligence" and finding that "[w]here . . . there has been no showing of negligence or other tortious conduct," the FTCA does not waive sovereign immunity for a violation of Chapter 21E. The Plaintiffs filed this timely appeal.

## II. ANALYSIS

Plaintiffs-Appellants claim that the United States is liable under Chapter 21E, Section 5, and common law negligence, for Appellants' costs associated with the oil contamination. The United States, however, enjoys sovereign immunity from such a suit absent a waiver that must be "unequivocally expressed in statutory text." Lane v. Pena, 518 U.S. 187, 192 (1996). A waiver will not be implied, and a waiver of the government's sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign." Id. Thus, "[t]o sustain a claim that the [United States] is liable for awards of monetary damages, the waiver of

sovereign immunity must extend unambiguously to such monetary claims." Id. And, "[a] statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text." Id.

Here, the Appellants argue that two statutory provisions, one contained in the RCRA, and the other contained in the FTCA, do waive the United States' sovereign immunity and thus the United States can be held liable for the costs allegedly incurred by Appellants as a result of the United States' past contamination of Lot 50. Finding that neither provision unequivocally expresses a statutory waiver as required by Lane, we affirm.

**A.        RCRA**

Appellants first contend that they can recover against the United States for its violations of Chapter 21E because RCRA Section 6001(a)(1) contains a waiver of the United States' sovereign immunity from liability for private monetary damages and/or because compliance with Chapter 21E is a "requirement" under Massachusetts state law. The district court found that the RCRA contained no such waiver, and dismissed Appellants' RCRA claims for lack of subject matter jurisdiction. We review the dismissal de novo. Aroostook Band of Micmacs v. Ryan, No. 04-1517, 2005 WL 845191, at *6 (1st Cir. Apr. 13, 2005).

Our inquiry begins (and ends in accordance with Lane) with the statutory text. The text of RCRA Section 6001(a), 42

-10-

U.S.C. § 6961(a), provides, in relevant part, that the United States government:

> shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. The Federal, State, interstate and local substantive and procedural requirements . . . include, but are not limited to, all administrative orders and all civil and administrative penalties and fines, regardless of whether such penalties or fines are punitive or coercive in nature or are imposed for isolated, intermittent, or continuing violations. The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement (including, but not limited to, any injunctive relief, administrative order or civil or administrative penalty or fine referred to in the preceding sentence, or reasonable service charge).

In our review of the statutory language, we first note the obvious: there is no express waiver of immunity for private suits seeking monetary damages. And, "a clear focus on the precise statutory language--'requirements . . . respecting control and abatement' including 'all administrative orders and all civil administrative penalties and fines'--does not plainly encompass response costs and thus does not evidence an unambiguous waiver of sovereign immunity to private suits for reimbursement of response costs. . . . At most, there is an ambiguity [in § 6961(a)] regarding a waiver, and such an ambiguity must be construed in

-11-

favor of immunity."  <u>McClellan Highway Corp.</u> v. <u>United States</u>, 95

F. Supp. 2d 1, 16, 17 (D. Mass. 2000).[8]  The district court was

correct to find that the RCRA did not waive the United States'

sovereign immunity in this case.[9]

**B.       FTCA**

The Appellants also bring two claims under the FTCA:  the

first alleges a violation of Chapter 21E and the second alleges

that the United States was negligent under common law principles.

Just as with the RCRA claims, Appellants must point to an

---

[8]Appellants argue that the 1992 amendments to the RCRA waiver
section expanded the United States' liability to cover the type of
claims at issue here, that is, private suits for monetary damages
associated with the cleanup of past contamination.  We disagree.
Although the amendments did further explain the requirements to
which the United States is subject without immunity, these
"requirements" are only those "respecting control and abatement of
solid waste or hazardous waste disposal and management."  Although
the amendments do include a statement that these "requirements"
include "any such substantive or procedural requirement (including
but not limited to, any injunctive relief, administrative order or
civil or administrative penalty or fine)," nowhere does the
original or amended language provide the unambiguous waiver with
respect to monetary damages as explicitly required by <u>Lane</u>.  <u>See</u>
518 U.S. at 192 ("To sustain a claim that the [United States] is
liable for awards of monetary damages, the waiver of sovereign
immunity must extend unambiguously to such monetary claims.").
And, private monetary damages are not similar enough to "any
injunctive relief, administrative order or civil or administrative
penalty or fine" to be covered by the "including but not limited
to" language in the statute.

[9]We note that in light of our conclusion that the RCRA does
not waive sovereign immunity from private suits for money damages
seeking reimbursement for cleanup costs, we do not address the
United States' argument that the RCRA waiver of sovereign immunity
is only for current and prospective acts of contamination, and does
not apply to past acts of contamination.

-12-

unequivocal waiver of the United States' sovereign immunity in the text of the FTCA.

In our review of a judgment on partial findings, entered pursuant to Federal Rule of Civil Procedure 52(c), "we evaluate the district court's conclusions of law de novo, and typically examine the district court's underlying findings of fact for clear error." Mullin v. Town of Fairhaven, 284 F.3d 31, 36-37 (1st Cir. 2002) (internal citations omitted).

We now turn to the statutory text of the FTCA to see if that statute contains an unequivocal waiver of the United States' sovereign immunity for the damages sought in this case. The text of the FTCA provides, in relevant part, that the United States has waived sovereign immunity

> for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). This provision is more promising for the Appellants as it expressly waives sovereign immunity for private suits seeking money damages--but, it does contain an important limitation: the damages must arise from the "negligent or wrongful act or omission" of a United States employee. Id. This means that the United States cannot be held liable under the FTCA without a showing of fault. In order to satisfy this "fault" requirement,

-13-

Appellants argue that a violation of Chapter 21E, on its own, is sufficient to establish "negligent or wrongful" conduct because it requires a showing that the offending party <u>caused</u> the contamination.

Chapter 21E states that "any person[10] who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site, shall be liable, without regard to fault." Chapter 21E § 5(a)(5).[11] Although the "without regard to fault" language suggests that the statute imposes strict liability, the Supreme Judicial Court of Massachusetts has held that the causation requirement of Chapter 21E, Section 5(a)(5) requires showing of more than mere ownership. <u>See</u> <u>Griffith</u> v. <u>N. Eng. Tel. & Tel. Co.</u>, 649 N.E.2d 766, 769 (Mass. 1995). Contrary to Appellants' contention, however, this does not mean that any violation of Chapter 21E is "negligent or wrongful" for purposes of the FTCA--it simply means that a prior owner cannot be held liable

---

[10]It is uncontested that the United States is a "person" for present purposes.

[11]Appellants also brought a claim under Section 5(a)(2) of Chapter 21E, which imposes liability on "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material." The Appellants appear only to discuss their claim on appeal under Section 5(a)(5), so we do not address the applicability of Section 5(a)(2), which does not explicitly cover oil contamination. <u>See, e.g.</u>, <u>Smilow</u> v. <u>Southwestern Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 43 (1st Cir. 2003) ("Issues raised on appeal in a perfunctory manner (or not at all) are waived.").

absent a showing that the prior owner caused the contamination. The plaintiff need not show that the prior owner was negligent or wrongful in doing so.

Appellants argue that the district court's grant of partial judgment was untimely because Dr. Rogers was going to testify that the United States "caused" the contamination. Even if we were to assume that the testimony of Dr. Rogers was sufficient to establish that the United States "caused" the contamination by installing tanks that likely corroded in three years, the Appellants have not shown how his testimony would establish that the United States was "negligent or wrongful." His proposed testimony would have established causation, not that the United States was "negligent or wrongful" in installing the tanks back in the 1940s.[12]

## III. CONCLUSION

For the above-mentioned reasons, the district court's order of dismissal of the RCRA claims and entry of judgment on

---

[12]Although Dr. Rogers testified in his deposition that "in the forties and fifties, the tank manufacturers and installers should "very definitely" "have known" about the problems that could arise from similar installations, he also testified that he "doubt[ed] very much" that the Navy would have known the tank would fail as it did. He also testified that thought that other entities "using or purchasing tanks" would "most probably not" have known about such a problem. Thus, even if Dr. Rogers were to testify to this effect at trial, this would not establish that the United States knew or should have known that the installation could cause a future problem.

partial findings for the United States on the FTCA claims are

**AFFIRMED.**