**Sarah D. WILLIAMS, Administratrix of the Estate of Berlie White, Deceased, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee,**

and

**Lenora Nations; Stephanie Lassiter; Madge Owle, Defendants.**

**170**

American Civil Liberties Union of North Carolina Legal Foundation, Incorporated, Amicus Curiae.

No. 00–1118.

United States Court of Appeals, Fourth Circuit.

Argued: Dec. 5, 2000.

Decided: March 2, 2001.

**ARGUED:** Norman Barrett Smith, Smith, James, Rowlett & Cohen, L.L.P., Greensboro, NC, for Appellant. John Samuel Koppel, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, for Appellee. **ON BRIEF:** David W. Ogden, Acting Assistant Attorney General, Mark T. Calloway, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellee. Marshall L. Dayan, Unti, Lumsden & Smith, Raleigh, NC; Seth Jaffe, Staff Attorney, American Civil Liberties Union of North Carolina, Raleigh, NC, for Amicus Curiae.

Before WILKINS and NIEMEYER, Circuit Judges, and BOYLE, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WILKINS joined. Chief Judge BOYLE wrote an opinion concurring in part and concurring in the result.

## OPINION

NIEMEYER, Circuit Judge:

We are presented with the question of whether the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, waives the United States' sovereign immunity with respect to a claim that an Indian hospital operated by the United States on the Cherokee Reservation in North Carolina wrongfully refused emergency medical treatment of a non-Indian person, causing his death. Because the decedent's estate can direct us to no duty under the "law of the place" where the alleged tort occurred that would require a "private [hospital] under like circumstances" to treat the decedent, 28 U.S.C. §§ 1346(b), 2674, we affirm the district court's judgment dismissing the claim for lack of subject matter jurisdiction.

I

The revised amended complaint in this case alleges that in October 1997, Berlie White, while at a restaurant in Cherokee, North Carolina, became short of breath, developing "various signs of respiratory distress." Asserting that he was suffering from a medical emergency, White presented himself at about 7:00 p.m. to the emergency room of the nearby Cherokee Indian Hospital, an Indian hospital operated on the Cherokee Reservation by the United States Public Health Service. Federal employees operating the hospital refused to treat White or to refill his oxygen tank because he was not Indian. They referred him to the Swain County Hospital in Bryson City, North Carolina, approximately 10 miles away. When White arrived at the Swain County Hospital, he was in extreme respiratory distress, and he died the next

day. The complaint alleges that White's death was caused by the Cherokee Indian Hospital's "refusal to provide any treatment or assistance" and "the delay of his access to medical care."

As administratrix of the estate of Berlie White, Sarah D. Williams commenced this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, alleging (1) that the United States violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by refusing to provide emergency medical care for White and by failing to stabilize his condition; (2) that the United States denied White equal protection of the laws and due process in violation of the Fifth Amendment; and (3) that the United States acted "intentionally to deprive [White], by reason of his non-Indian race and ethnicity, the services that would have been readily provided to an Indian," in violation of North Carolina law.

The United States filed a motion to dismiss, based on the contention that the FTCA did not waive the United States' immunity for the claims asserted and therefore that the court lacked subject-matter jurisdiction. The district court agreed, dismissing the action. In doing so, it held that "the FTCA does not create liability for the federal government based upon violations of federal law" and that North Carolina has no law creating a duty in favor of a private person to provide medical treatment or to recover for a discriminatory refusal to provide medical treatment.

This appeal followed.

## II

The viability of Williams' action against the United States depends on the scope of the FTCA. Although the first count of her complaint was ambivalent about whether it was a direct action against the United States for violation of EMTALA, 42 U.S.C. § 1395dd, or whether it is based on a federal claim for which sovereign immunity was waived by the FTCA, she now acknowledges that because EMTALA does not contain a waiver of sovereign immunity, her claim is based on 28 U.S.C. § 2674, which makes the United States liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." Through the gateway of that provision, Williams argues that EMTALA "creates standards of conduct" that are covered by the FTCA. Likewise, she argues that the United States' immunity for claims based on the Fifth Amendment are waived by the FTCA. Alternatively, she argues that North Carolina law provides the applicable duty. She asserts that, in North Carolina, hospitals are prohibited "from denying emergency treatment on the basis of race."

It is well established that the United States may not be sued without its consent and that its consent must be unequivocally manifested in the text of a statute. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of scope, in favor of the sovereign." *Id.* These principles govern our approach in construing the FTCA. This Act provides:

> The United States shall be liable, respecting the provisions of this Title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . . .

28 U.S.C. § 2674. And § 1346(b) of Title 28 vests jurisdiction over FTCA claims in federal district courts, but only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). This statutory waiver includes numerous limitations, and specifically, as relevant here, § 2680(a) provides that the government is not liable on a claim "based upon an act or omission of an employee of the Government . . . based

upon the exercise or performance or failure to exercise or perform a discretionary function or duty ... whether or not the discretion involved be abused."

### III

■ As to her federal claims, Williams contends that the "law of the place" governing the definition of torts for which the United States is liable includes federal law, particularly the law supporting her claims based on EMTALA and on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

First, the FTCA was not intended to constitute a waiver for federal claims. The FTCA waives immunity only for torts grounded in the law of "the place where the act or omission occurred." While the "law of the place" may be understood in the abstract to include all law, both federal and state, in the context of a federal enactment, "the law *of the place*" suggests a more localized law than the national law. Congress surely would not have used that language if it intended to waive its immunity from tort liability nationally for claims under every federal enactment. Moreover, if the FTCA were to be a general waiver of federal governmental immunity from suit, there would be no need for Congress and the courts to consider in connection with each enactment whether such a waiver is manifested by explicit language. *See, e.g., Lane*, 518 U.S. at 192–200, 116 S.Ct. 2092 (focusing on the language of the Rehabilitation Act).

■ This conclusion that the FTCA does not waive the United States' immunity against liability for violation of its own statutes, absent specific language in the substantive federal statute allegedly giving rise to the duty, comports with the universally accepted position that "law of the place," as used in the FTCA, refers to state and local law, not federal law. As the Supreme Court stated in *FDIC v.*

*Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), "Indeed, we have consistently held that § 1346(b)'s reference to the 'law of the place' means the law of the State—the source of substantive liability under the FTCA." *See also United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir.1999) ("The underlying principle is that the FTCA's waiver of sovereign immunity is limited to conduct for which a private person could be held liable under state tort law," not federal statutory law); *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 536 (1st Cir. 1997) ("It is virtually axiomatic that the FTCA does not apply 'where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs' "); *id.* (holding that "violation of a federal statute by governmental actors does not create liability unless state law would impose liability on a 'private individual under like circumstances' "); *Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir.1996) ("The test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred"); *Johnson v. Sawyer*, 47 F.3d 716, 727–28 (5th Cir. 1995) (en banc) ("While as a matter of abstract linguistics the phrase 'law of the place' ... might be thought to include generally applicable federal law, it does not").

But even assuming, as Williams contends, that the law of the place includes the duties imposed by EMTALA, those duties are not applicable here.

EMTALA imposes on participating hospitals[1] duties (1) to provide to persons presented for treatment "an appropriate medical screening ... to determine whether or not an emergency medical condition ... exists," and (2) to stabilize the condi-

---

1. The United States has conceded that the Cherokee Indian Hospital receives Medicare

funding and therefore is a "participating" hospital.

tion or, if medically warranted, to transfer such persons to other facilities. 42 U.S.C. § 1395dd(a)-(c); *see also Brooks v. Md. Gen. Hosp., Inc.,* 996 F.2d 708, 710 (4th Cir.1993). The Act, passed by Congress in response to a growing concern that hospitals were "dumping" patients who were unable to pay, requires hospitals to perform these duties uniformly, regardless of whether the persons arriving in the emergency rooms are insured or are able to pay. *Id.* at 711 n. 4. As we stated in *Brooks,*

> Congress expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency. Under traditional state tort law, hospitals are under no legal duty to provide this care. Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it.

*Id.* at 710; *see also Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir. 1994); *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 880 (4th Cir.1992). Thus, Williams alleges that the United States is liable under EMTALA in denying White emergency medical treatment.

It is true that EMTALA imposes a duty on any participating hospital to provide emergency medical care generally. Nevertheless, this duty is restricted in the case of Indian hospitals operating under the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.,* by the express terms of that Act.

The Indian Health Care Improvement Act was enacted to "fulfill[] ... [the Nation's] special responsibilities and legal obligation to the American Indian people, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy." 25 U.S.C. § 1602(a). In particular, having found that "the unmet health needs of the American Indian people are severe and the health status of the

Indians is far below that of the general population of the United States," *id.* § 1601(d), Congress enacted many provisions with the intention of attempting to achieve "parity" between Indian and non-Indians with respect to health care, *id.* § 1621(g). This goal of achieving parity between the opportunities of Indians and non-Indians permeates the Indian Health Care Improvement Act, extending, for example, even to the granting of preferences for Indian and tribal-owned construction companies in contracts to build Indian health service facilities. *See, e.g., id.* § 1633(a).

To achieve its purpose of elevating the health status of Indians to the level of the general population, 25 U.S.C. §§ 1601(d), 1602(a), Congress directed that funds expended under the Act be spent only on projects having specified purposes, such as the "eliminati[on] [of] the deficiencies in health status ... of all Indian tribes," *id.* § 1621(a)(1). Moreover, because the purpose of the Act is to eliminate existing disparities between the overall health of Indians and non-Indians, the limited funds allocated to the programs under the Act may be used only to this end, that is, only to aid Indians designated as beneficiaries of the Act. *See id.* §§ 13, 1603, 1621. Thus, by the Act's express terms, hospitals, such as the Cherokee Indian Hospital, are prohibited, with stated exceptions, from treating non-Indians, even in cases that would, in the absence of the Act's explicit prohibition, be covered by EMTALA.

One exception, relevant here, permits Indian hospitals to provide emergency medical treatment to non-Indians. But unlike the EMTALA provision prohibiting discrimination, the Indian Health Care Improvement Act permits, *but does not mandate,* the provision of emergency medical treatment to non-Indians. Section 1680c states that the Indian Health Service "*may* provide health services [to non-Indians] in order to achieve stability in a medi-

cal emergency." 25 U.S.C. § 1680c(c)(1) (emphasis added).

■ Thus, even if federal statutory duties were thought to be included in the claims for which the United States waived immunity in the FTCA, the Cherokee Indian Hospital in this case would have no duty to treat a non-Indian person presenting himself for emergency treatment. At most, Williams could argue that the hospital was authorized to treat non-Indians and was negligent in failing to exercise that discretion in a manner that was appropriate to the circumstances, but this form of tort based on an abuse of discretion is excepted from the waiver of the FTCA.

Under the FTCA, when employees of the United States fail "to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused," their conduct, if grounded in governmental policy, may not form the basis of a suit against the United States. 28 U.S.C. § 2680(a); *see also United States v. Gaubert,* 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (observing that "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations"); *United States v. Varig Airlines,* 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (pointing out that the FTCA does not waive sovereign immunity for the permissible exercise of judgment affecting governmental policy). Because the Indian Health Care Improvement Act, which provides generally for the medical care of only Indians, permits, but does not mandate, the provision of emergency medical treatment to non-Indians, the decision of whether to provide such emergency medical treatment is at the hospital's discretion. The exercise of that discretion by the hospital and its personnel, even if it amounts to an abuse, falls within the discretionary-function exception because it af-

fects a policy of the United States, i.e., the policy of providing health facilities for Indians in furtherance of the Indian Health Care Improvement Act. Decisions of this kind have routinely been found to fall within the discretionary-function exception of the FTCA. *See Sutton v. Earles,* 26 F.3d 903, 908 (9th Cir.1994) (holding that the discretionary-function exception is applicable to decisions whether to enforce boating regulations); *Kiehn v. United States,* 984 F.2d 1100, 1108 (10th Cir.1993) (holding the exception applicable to failures to warn of unstable rock conditions and negligence in governmental rescue efforts); *Galvin v. OSHA,* 860 F.2d 181, 184 (5th Cir.1988) (finding the exception applicable to failure to conduct OSHA inspection when statute and regulations authorize, but do not require, such inspections); *Begay v. United States,* 768 F.2d 1059 (9th Cir.1985) (applying the exception to failure to warn uranium miners of dangers in uranium mining).

■ Williams also contends that the FTCA waives federal immunity for her *Bivens* claim. But this claim fares no better than her EMTALA claim. The Supreme Court's holding in *FDIC v. Meyer,* 510 U.S. at 477–78, 114 S.Ct. 996, explicitly forecloses Williams' argument. The *Meyer* court explained that because the "law of the place" encompasses state law, but not federal law, a federal constitutional tort cannot provide the source of law under the FTCA. "By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right. To use the terminology of *Richards [v. United States,* 369 U.S. 1, 7–8, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)], the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims." *Id.* at 478, 114 S.Ct. 996.

IV

■ Turning to Williams' alternative contention that state law creates a duty to provide emergency medical treatment or a

duty not to discriminate in refusing to provide emergency medical treatment, the common law of North Carolina provides Williams with no support to bring a claim against the Cherokee Indian Hospital.[2] We can consider this question, however, only if we assume that the hospital personnel's conduct did not fall within the discretionary-function exception of 28 U.S.C. § 2680(a).

The North Carolina Supreme Court has held that a physician has no duty to render services to every person seeking them. *See Childers v. Frye,* 201 N.C. 42, 158 S.E. 744 (1931). The *Childers* court based its decision on a contract theory, concluding that a physician's decision of whether to treat a person amounts to a decision of whether to enter into a contractual relationship. In the case of an unconscious patient, where a traditional contract relationship could not be formed, the court explained that liability would then be established only if "the physician actually accepted an injured person as a patient and undertook to treat him." *Id.* at 746. Holding that the common law does not limit a medical provider's discretion to turn away potential patients, the court found it unobjectionable that the doctor had refused to treat the patient because he mistakenly believed the patient was drunk. *See id.*

Despite the holding in *Childers,* Williams advances four theories as to why a healthcare provider in North Carolina has a duty not to discriminate in the provision of emergency medical care. First, she argues that N.C.G.S. § 58–65–85, which prohibits nonprofit hospitals from discriminating on the basis of race, color, and national origin, would provide her with a cause of action against a private hospital. This provision, however, is part of North Carolina's Insurance Code and applies only to nonprofit hospitals seeking reimbursement from the North Carolina Department of Insurance. Moreover, the statute does not apply to every private hospital. Most importantly, we have been unable to find any North Carolina case that interprets this statute to give rise to a private cause of action.

Second, Williams directs us to N.C.G.S. § 131A–8, a statute pertaining to hospitals receiving state financing, which states, "All health care facilities shall be operated to serve and benefit the public and there shall be no discrimination against any person based on race, creed, color or national origin." Again, this statute does not provide a private enforcement mechanism. Arguably, the North Carolina Medical Care Commission is authorized to enforce this nondiscrimination rule under § 131A–4(B) (allowing the Commission to sue and be sued). While § 131A–15 permits "[a]ny holder of bonds or notes issued under the provisions of this Chapter" to bring suit to enforce his contractual rights under the bond, this provision does not authorize a private enforcement action against a hospital that has discriminated in violation of . § 131A–8.

Third, Williams relies on the Patients' Bill of Rights, § 3C.4103, a state agency rule promulgated pursuant to the Hospital Licensure Act, N.C.G.S. § 131E–75. Again, however, the legislature provided for enforcement of this Act only by the North Carolina Department of Health and Human Services. *See* N.C.G.S. § 131E–79(b).

2. Although the Cherokee Indian Hospital is located on the Cherokee Reservation, suggesting that the law of the Eastern Band of Cherokees might be applicable as the "law of the place," *see* 25 C.F.R. § 11.500, the parties agree that there is no tribal law applicable to the provision of emergency medical treatment and that any tribal resolution would look, in these circumstances, to applicable federal and North Carolina law. Therefore, we need not determine whether tribal law, rather than state law, constitutes the applicable law of the place. *Compare Cheromiah v. United States,* 55 F.Supp.2d 1295, 1302–05 (D.N.M.1999) (holding that tribal law, not state law, is the law of the place for a tort committed in a federally-owned hospital on an Indian reservation), *with Louis v. United States,* 54 F.Supp.2d 1207, 1209–10 (D.N.M.1999) (reaching the opposite conclusion).

Finally, Williams, relying on a Georgia case, asserts a common law duty based on her theory that a hospital emergency room is a "public utility." *See Williams v. Hosp. Auth.*, 119 Ga.App. 626, 168 S.E.2d 336, 337 (1969) ("To say that a public institution which has assumed this duty and held itself out as giving such aid can arbitrarily refuse to give emergency treatment to a member of the public who presents himself with 'a broken arm and in a state of traumatic injury, suffering mental and physical pain visible and obvious to the hospital employees' is repugnant to our entire system of government"). In *Williams*, however, the court "express[ed] no opinion on the [existence of a] duty of a *private* hospital in Georgia." *Id.* (emphasis added). And under the FTCA, Williams would have to show that the Cherokee Indian Hospital was liable as a "private individual," not as a public utility. But more relevant to this case, there is no indication that North Carolina recognizes such a public utility theory. Indeed, the reason Congress enacted EMTALA in large part was because states generally had not made tort remedies available for the refusal to provide emergency care. *See Bryan v. Univ. of Va.*, 95 F.3d 349, 351 (4th Cir.1996) ("Under traditional state tort law, hospitals are under no legal duty to provide [emergency medical] care" (quoting *Brooks*, 996 F.2d at 710)).

## V

The scope of duties imposed by positive law is necessarily narrower than the reach of moral command, and this case presents a tragic circumstance, if the allegations of the complaint are true, that could have been avoided by simple obedience to a moral command. That individuals at the Cherokee Indian Hospital would deny Berlie White the most meager of medical assistance—that of refilling his oxygen tank when it had run out—at a time of extreme need is incomprehensible, particularly when these individuals were not prohibited by law from providing White with this

assistance. If they did deny White this minimal care, the burden of their moral failure will surely remain with them. But the positive law of the United States does not, in our judgment, authorize a suit for damages against the United States for refusing to provide medical assistance, as we have explained herein.

*AFFIRMED.*

BOYLE, Chief District Judge, concurring in part and concurring in the result:

While I concur in the result reached and the basic reasoning of the majority opinion, I write separately in order to note a portion of the opinion with which I disagree.

As discussed in the majority opinion, the unfortunate outcome in this case is mandated by the doctrine of sovereign immunity. Under such doctrine, the Federal Government is immune from suits for damages, except to the extent that it has made an unequivocal, express waiver of its immunity. *See Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

While the Federal Government has made a limited waiver of sovereign immunity, under the FTCA, it has done so only for those cases in which a private person would be liable under the "law of the place" in which the claim arose. *See* 28 U.S.C. § 1346(b)(1).

In this case, the "law of the place" is the law of the state of North Carolina. Because EMTALA is a federal statute, it does not qualify as the "law of the place" for purposes of the FTCA. Moreover, as its text plainly shows, EMTALA itself makes no mention of the United States government and contains no "unequivocally expressed" waiver of sovereign immunity. Therefore, the United States has not waived its immunity from suits brought under EMTALA and Williams must state her claim, as required by the FTCA, under North Carolina law. Though unjustly so,

a private person or hospital may not be held liable, under the laws of North Carolina, for denying emergency care, on the basis of race, to a person in need of such care. For this reason alone, the United States may not be held liable for denying emergency treatment to Williams' deceased.

While this initial reasoning is sufficient basis upon which to affirm, the majority goes beyond this reasoning to discuss why, even if it were not immune from suits brought under EMTALA, the United States could not be held liable thereunder, in this case, because the Cherokee Indian Hospital is governed by the Indian Health Care Improvement Act ("IHCIA"). I do not agree with this reasoning, because there is no language, in the IHCIA or elsewhere, that exempts an Indian hospital that is also a "participating hospital"[1] under EMTALA from the emergency-care duties imposed upon it by EMTALA.

EMTALA requires that, in emergency situations, participating hospitals must provide stabilizing treatment or necessary transfer services to *"any* individual ... [that] comes to a hospital" and is determined to be in need of emergency care. *See* 42 U.S.C. § 1395dd(b)(1) (emphasis added). While the IHCIA bars Indian hospitals from providing medical care to non-Indian individuals as a general matter, this exclusion is expressly limited, by the terms of the IHCIA, to non-emergency situations. Specifically, the IHCIA provides that, notwithstanding limitations imposed elsewhere in the Statute, Indian hospitals *"may provide health services* under this subsection to ... [otherwise ineli-

gible] individuals ... in order to ... achieve stability in a medical emergency...." 25 U.S.C. § 1680c(c)(1) (emphasis added).

In this case, the Cherokee Indian Hospital receives Medicare funding and is therefore a "participating hospital" under EMTALA. As a participating hospital under EMTALA, the Cherokee Indian Hospital has *an absolute duty* to provide medical or transport services to any individual, Indian or non-Indian, in need of emergency care. The Cherokee Indian Hospital is also an administrative entity within the Indian Health Service, and is therefore governed by the Indian Health Care Improvement Act. As a hospital governed by the IHCIA, the Cherokee Indian Hospital has *an absolute right* to provide services to a non-Indian individual, so long as the individual is in need of emergency care. Because EMTALA requires it to do so and the IHCIA allows it to do so, these Statutes, together, place the Cherokee Indian Hospital under a duty to provide care in emergency situations to all individuals in need of stabilizing care, irrespective of race. Moreover, this duty to provide emergency medical care is not a matter of discretion, because it is clearly mandated by EMTALA.

Had the Federal Government chosen to waive its immunity from suit under EMTALA, the United States could have been held liable for the breach of duty that was alleged to have occurred in this case. Unfortunately for Williams, the Government has not waived its immunity from suit under EMTALA. Therefore, at least in the state of North Carolina,[2] such a breach

---

1. A hospital is a "participating hospital" under EMTALA if it receives Medicare funding. *See* 42 U.S.C. § 1395dd(e)(2). In this case, as noted in the majority opinion, the United States concedes that the Cherokee Indian Hospital receives Medicare funding and is therefore a "participating hospital" under EMTALA.

2. As discussed, the duty to provide emergency care to all persons in need, irrespective of race, may not be enforced under the FTCA as

against any federally-run hospital in North Carolina, because, in the state of North Carolina, no state-law basis exists upon which to bring such a claim. If the common or statutory law of a state did, however, recognize a cause of action against a private person or hospital for a breach of duty to provide medical care in an emergency situation, a person aggrieved by a federal entity for breach of that duty could bring a suit against the federal entity in that state. In such a case, the Gov-

of statutory duty on the part of a federal hospital, however morally repugnant, remains beyond reproach in the courts.

For these reasons, I am not able to join the majority's reasoning that hospitals governed both by EMTALA and the IH-CIA are under no duty to provide emergency medical care to non-eligible patients. However, I concur in the balance of the majority opinion, as well as in the result.

ernment would have waived its immunity from such a suit under the FTCA.