Cathrine DAWKINS, Executrix of the Estate of Philip R. DAWKINS, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mildred Lassiter Moates and Olin Dellano Moates, Plaintiffs,

v.

United States of America, Defendant.

Felton Albert Hatcher, Jr., Administrator CTA of the Estate of Patricia W. Hatcher, Deceased; and Executor of the Estate of Felton Albert Hatcher, Sr., Deceased, Plaintiff,

v.

United States of America, Defendant.

Nos. CIV.1:01CV00822,
CIV.1:01CV00823,
CIV.1:01CV00824.

United States District Court,
M.D. North Carolina.

Aug. 22, 2002.

Henry Little Kitchin, Stephan R. Futrell, Kitchin, Neal Webb Webb & Futrell, L.L.P., Rockingham, NC, for plaintiff.

Gill P. Beck, Office of U.S. Atty., Greensboro, NC, James E. Howard, U.S. Dept. of Justice Civil Div., Torts Branch, Washington, Dc, for defendant.

*MEMORANDUM OPINION*

BULLOCK, District Judge.

Presently before the court are three cases arising out of a 1991 fire at a chicken processing plant in Hamlet, North Carolina. The plaintiffs, Cathrine Dawkins, as Executrix of the Estate of Philip R. Dawkins, (Civil No. 1:01CV00822), Mildred Lassiter Moates and Olin Dellano Moates (Civil No. 1:01CV00823), and Felton Albert Hatcher, Jr., Administrator CTA of the Estate of Patricia W. Hatcher and Executor of the Estate of Felton Albert Hatcher, Sr., (Civil No. 1:01CV00824) (collectively "Plaintiffs"), each brought suit against the United States of America (the "Government") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. Plaintiffs allege that the United States Department of Agriculture ("USDA") and its Food Safety Inspection Service ("FSIS") negligently contributed to the losses suffered by Plaintiffs when FSIS employees gave their approval to the plant operators' locking of emergency exits prior to the fire. The cases are before the court on the Government's motions to dismiss Plaintiffs' claims. For the following reasons, the court will grant the Government's motion to dismiss.

REGULATORY BACKGROUND

The Food Safety and Inspection Service is a branch of the United States Department of Agriculture that focuses on (as its name suggests) food safety and inspection. Pursuant to 9 C.F.R. § 300.2, the FSIS is charged with implementing several Acts of Congress, among them the Poultry Products Inspection Act, 21 U.S.C. § 451 *et seq.* ("PPIA"). Implementation of the PPIA is one of the "primary regulatory responsibilities" of the FSIS. 9 C.F.R. § 300.3(a). Congress enacted the PPIA because it believed that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451. Through the PPIA, Congress authorized the Secretary of Agricul-

ture to promulgate regulations "to protect the health and welfare of consumers." 21 U.S.C. § 451; *see also* 21 U.S.C. §§ 456, 463. Pursuant to the PPIA, the Secretary of Agriculture promulgated detailed regulations governing poultry inspection and sanitation at poultry-processing plants and charged the FSIS with implementing these regulations. 9 C.F.R. § 381.1 *et seq.* In accordance with the regulations promulgated under the authority of the PPIA, the FSIS conducts inspections of poultry-processing plants. The purpose of these inspections, consistent with the purpose of the PPIA, is to protect the "health and welfare of consumers" "by assuring that poultry products distributed to them are wholesome, not adulterated." 21 U.S.C. § 451.

The operations of the FSIS are outlined not only in agency regulations but also in agency directives. Two agency directives arguably relevant to the present cases are FSIS Directives 4791.1 and 4791.6.

Part Five of FSIS Directive 4791.1 pertains to accident prevention and health within Meat and Poultry Inspection Operations ("MPIO"). (Def.'s Mot. to Dismiss at Ex. 1, Tab A, FSIS Directive 4791.1 at 33.) This directive focuses on the safety and health of FSIS employees. With regard to safety and health, MPIO policy is to prevent accidents and to provide a healthful environment for federal employees. (*Id.*) FSIS Directive 4791.1 also includes provisions relating to hazard reporting as a means of reducing or eliminating "all hazards to MPIO employees." (*Id.* at 39.)

FSIS Directive 4791.6 pertains to emergency procedures in the workplace. (Def.'s Mot. to Dismiss at Ex. 1, Tab B,

FSIS Directive 4791.6 at 1.) This directive, similar to FSIS Directive 4791.1, focuses on the safety of FSIS employees. (*Id.* at 2.)[1]

Part VIII of FSIS Directive 4791.6 ("Part VIII") deals with developing an "Occupant Emergency Plan." (*Id.*) It states that Inspectors–In–Charge ("IICs") or supervisors "develop and implement a written Occupant Emergency Plan for every workplace if no plan exists." (*Id.*) Part VIII suggests that the Occupancy Emergency Plan "should be comprehensive enough to deal with all emergencies that can reasonably be expected to develop" and that a standardized plan for the entire workplace is acceptable. (*Id.*) Part VIII states that the Occupant Emergency Plan must include, at a minimum, certain specified elements[2] and that the Occupant Emergency Plan is to be posted on the "Government bulletin board" or in some other appropriate location for FSIS employees to review. (*Id.*)

Part X of FSIS Directive 4791.6 ("Part X") includes several provisions that relate to the proper handling of emergencies. Part X states that "FSIS supervisors and IIC's are responsible for the safety and health of their subordinates." (*Id.* at 3.) It is noteworthy that Part X does not impose upon FSIS supervisors and IICs the responsibility for the safety and health of anyone other than FSIS employees. In fact, much of Part X outlines responsibilities of plant owners and managers. For example, Part X states that it is the responsibility of plant management to identify exits with "Exit" signs and to identify non-exit doors and stairways with "Not an Exit" signs. (*Id.*) Additionally, plant man-

---

1. "This directive is primarily directed to FSIS employees performing duties at private sector workplaces." (Def.'s Mot. to Dismiss at Ex. 1, Tab B, FSIS Directive 4791.6 at 2.)

2. The Occupant Emergency Plan must include, among other things, emergency escape procedures and a floor plan or map that identifies an emergency escape route and an alternative escape route. (Def.'s Mot. to Dismiss at Ex. 1, Tab B, FSIS Directive 4791.6 at 2.)

agement is responsible for keeping exit doors unlocked when the building is occupied. (*Id.*) Part X does permit exit doors to be locked during working hours if the exit doors have devices that "provide immediate exit in the event of an emergency." (*Id.*) Thus, the locking of exit doors is permitted if plant owners and managers take the necessary precautions.

## FACTS

### A. The Imperial Plant

The relevant facts, as alleged in Plaintiffs' complaints, are as follows. During the time of the events that gave rise to this litigation, Imperial Food Products, Inc. ("Imperial") operated a chicken-processing plant (the "Imperial Plant") in Hamlet, North Carolina.[3] The Imperial Plant was visited almost daily by agents of the USDA and its FSIS. The FSIS inspectors assigned to the Imperial Plant were Grady Hussey and Kenneth Booker (the "FSIS Inspectors"). Hussey and Booker were stationed in Fayetteville, North Carolina; however, Imperial maintained for their use an office in a building across the street from the Imperial Plant.

### B. Imperial's Locking and Blocking of Doors

In the months preceding the fire at the Imperial Plant, Imperial management elected to lock and/or block certain doors in the Imperial Plant as a means of remedying a food safety hazard caused by flies in the Imperial Plant. The FSIS Inspectors approved the locking and/or blocking of doors as proposed by Imperial management for "fly control." The FSIS Inspectors also knew of a locked door in the Imperial Plant breakroom.

### C. The Fire at the Imperial Plant

On September 3, 1991, at approximately 8:20 a.m., a fire developed in the processing room of the Imperial Plant. The fire spread to all production areas of the plant Many Imperial employees and others present in the Imperial Plant at the time were unable to escape the fire due to the locked and/or blocked exit doors. Several people were injured or killed in the fire. Among those killed in the fire was Philip R. Dawkins,[4] who was an employee of Lance Crackers, Inc., servicing vending machines in the Imperial Plant's breakroom at the time of the fire. Among those injured in the fire were Patricia W. Hatcher[5] and

---

**3.** In their respective complaints, Plaintiffs make much of the fact that Imperial operated a chicken-processing plant in Pennsylvania that received numerous citations from the federal Occupational Safety and Health Administration ("OSHA"). Plaintiffs suggest that this fact should have put the USDA and the FSIS on notice of Imperial's noncompliance with occupational safety rules and regulations in the Imperial Plant in Hamlet, North Carolina. The court finds this fact irrelevant to the disposition of these cases. First, the FSIS is in the business of food safety and inspection. Second, Plaintiffs incorrectly assume the existence of some interstate, interagency line of communication through which local or regional OSHA offices would transmit information about noncompliant businesses to local and/or regional FSIS offices in every other state in the country. Third, the federal government does not even monitor

North Carolina businesses for compliance with OSHA. North Carolina has created its own state agency that enforces the Occupational Safety and Health Act of North Carolina, N.C. Gen.Stat. § 95–126 *et seq.* ("OSHANC").

**4.** Philip R. Dawkins is represented here by Plaintiff Cathrine Dawkins as Executrix of the Estate of Philip R. Dawkins.

**5.** Patricia W. Hatcher passed away on May 2, 2000. She is represented here by her son, Plaintiff Felton Albert Hatcher, Jr., as Administrator CTA of the Estate of Patricia W. Hatcher. Plaintiff Felton Albert Hatcher, Jr., also represents his late father, Felton Albert Hatcher, Sr., who had asserted a loss of consortium claim arising out of Patricia W. Hatcher's claims.

Plaintiff Mildred Lassiter Moates,[6] both of whom were employed by Imperial at the time of the fire.

## PROCEDURAL HISTORY

Plaintiffs' actions originally began as administrative claims against the Government filed with the USDA and its FSIS on or about December 18, 1992. The Government withheld acting on these claims until all actions against other parties were resolved. After all such actions against other parties were resolved by settlement or otherwise,[7] these claims were resubmitted on or about May 17, 2000. The Government denied Plaintiffs' claims on or about July 11, 2001. Plaintiffs filed the present actions on or about August 31, 2001. The cases are presently before the court on the Government's motions to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

## DISCUSSION

The United States as sovereign is immune from suit except as it consents to be sued. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). A plaintiff bringing a claim against the United States bears the burden of identifying an "unequivocal" waiver of sovereign immunity. *Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995). The subject matter jurisdiction granted to the federal courts pursuant to a waiver of sovereign immunity by the United States must be strictly construed. *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951).

The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 ("FTCA"), is a limited waiver of sovereign immunity, expressly authorizing suits against the United States for damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). The Supreme Court has construed the "law of the place" language of the FTCA to include only state law, not federal law. *FDIC v. Meyer,* 510 U.S. 471, 478, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("Indeed, we have consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA."); *see also Williams v. United States,* 242 F.3d 169, 173 (4th Cir.2001). The FTCA further provides that the manner and extent of the United States' liability for tort claims is the same "as a private individual under like circumstances." 28 U.S.C. § 2674. Therefore, in order to recover under the FTCA, a plaintiff must demonstrate that state tort law provides a

---

**6.** Plaintiff Mildred Lassiter Moates' complaint is joined by her husband, Plaintiff Olin Dellano Moates, who has asserted a loss of consortium claim.

**7.** A negligence action against the North Carolina Department of Labor under the State Tort Claims Act for failure of its Occupational Safety and Health Division to conduct inspections of the Imperial Plant prior to the fire

was rejected by the North Carolina Supreme Court, despite the fact the division conducted their first and only inspection in the plant's history after the fire and issued eighty-three citations for violations of safety standards. Applying the public duty doctrine, the court held that the State Department of Labor owed no duty to the individual plaintiffs. *Stone v. North Carolina Dept. of Labor,* 347 N.C. 473, 495 S.E.2d 711 (1998).

cause of action against a private individual under analogous circumstances.

■ In the present case, the parties disagree whether North Carolina law provides such a cause of action. Under North Carolina law, a tort plaintiff "must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach." *Kientz v. Carlton,* 245 N.C. 236, 240, 96 S.E.2d 14, 17 (1957) (citations omitted). The parties' dispute focuses on whether North Carolina law imposes upon the Government an affirmative duty to protect workers in the Imperial Plant from the hazards of fire.

■ Plaintiffs argue that there are multiple sources of an affirmative duty to protect workers in the Imperial Plant from the hazards of fire. In their respective complaints, Plaintiffs often refer to FSIS regulations and directives as imposing upon the Government a duty to protect workers in the Imperial Plant from hazards of fire. (*E.g.,* Dawkins Compl. at ¶ 14; Moates Compl. at ¶ 14; Hatcher Compl. at ¶ 14.) To the extent Plaintiffs rely upon FSIS regulations and directives as the source of a duty, Plaintiffs' argument fails because federal law cannot provide the basis for a claim under the FTCA. *Williams,* 242 F.3d at 173.

The only state law basis for a tort duty that Plaintiffs assert is Section 324A of the Second Restatement of Torts, which has been applied by the North Carolina Court of Appeals. *Restatement (Second) of Torts* § 324A (1965); *see Quail Hollow East Condominium Ass'n v. Donald J. Scholz Co.,* 47 N.C.App. 518, 522, 268 S.E.2d 12, 15 (1980); *Mozingo v. Pitt County Mem'l Hosp., Inc.,* 101 N.C.App. 578, 587, 400 S.E.2d 747, 752 (1991). Section 324A of the Second Restatement of Torts states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts* § 324A (1965).

Plaintiffs argue that in conducting food safety inspections and approving Imperial's remedial actions to correct a "fly control" problem, the Government undertook a duty to ensure that Imperial carried out its actions in a manner that protected Imperial workers (and others present in the Imperial Plant) from "the risk of fire and fire hazards" in the workplace. (Dawkins Compl. at ¶ 14.) Plaintiffs also argue that in assuming the responsibility for the health and safety of its own employees, the Government undertook a duty to protect Imperial employees (and others in the Imperial Plant) from fire hazards.

There are several obstacles to Plaintiffs' argument, any one of which precludes the existence of a tort law duty as asserted by Plaintiffs here. First, the North Carolina Supreme Court has not recognized a tort law duty based upon Section 324A of the Restatement of Torts. Plaintiffs cite only two North Carolina decisions applying Section 324A, *Quail Hollow,* 47 N.C.App. 518, 268 S.E.2d 12, and *Mozingo,* 101 N.C.App. 578, 400 S.E.2d 747. Neither is from North Carolina's highest court. Each is easily distinguishable. *Quail Hollow* concerns a peculiar area of tort law involving architect liability, which the North Carolina Court of Appeals described

as "an area of enormous concern within the legal community" whose scope of liability "has undergone considerable expansion." *Quail Hollow,* 47 N.C.App. at 522, 268 S.E.2d at 15. *Mozingo* is factually dissimilar to the case at hand in that it involves medical malpractice. *Mozingo,* 101 N.C.App. 578, 400 S.E.2d 747. Furthermore, the court of appeals' discussion of Section 324A was not mentioned by the North Carolina Supreme Court when it affirmed *Mozingo* on completely independent grounds. *Mozingo v. Pitt County Mem'l Hosp., Inc.,* 331 N.C. 182, 415 S.E.2d 341 (1992).

In a case such as this, in which no precise state precedent exists, the court must determine how the state supreme court would rule in a similar situation. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). It is unlikely that the North Carolina Supreme Court would impose on a defendant any tort duty based on the Second Restatement of Torts. *See Cassell v. Collins,* 344 N.C. 160, 163, 472 S.E.2d 770, 772 (1996) ("We reemphasize yet again that the Restatement of Torts is *not* North Carolina law."); *see also Stone v. North Carolina Dep't of Labor,* 347 N.C. 473, 495 S.E.2d 711 (1998), footnote 7 *supra.*

Assuming *arguendo* that the North Carolina Supreme Court would recognize a tort duty based on the Second Restatement of Torts, an application of the factors utilized by the North Carolina Court of Appeals in *Quail Hollow* and *Mozingo* (the two Section 324A cases from North Carolina cited by Plaintiffs) indicate that the North Carolina Supreme Court would not recognize the Restatement-based tort duty asserted by Plaintiffs here. In both *Quail*

*Hollow* and *Mozingo,* the North Carolina Court of Appeals determined whether Section 324A created a tort duty by analyzing and balancing several factors.

'Whether ... a party has placed himself in such a relation with another so that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that the other will not be injured calls for the balancing of various factors: (1) the extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.'

*Quail Hollow,* 47 N.C.App. at 524–25, 268 S.E.2d at 17 (quoting *United Leasing Corp. v. Miller,* 45 N.C.App. 400, 406–07, 263 S.E.2d at 313, 318 (1980)); *see also Mozingo,* 101 N.C.App. at 588, 400 S.E.2d at 752. Another factor to consider in determining whether a duty exists is the "'extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach.'" *Mozingo,* 101 N.C.App. at 588, 400 S.E.2d at 752 (quoting W. Prosser & W. Keeton, *The Law of Torts* § 53 at 359 n.24 (5th ed.1984)).

In this case, the foregoing factors must be applied to two separate Government undertakings: (1) the FSIS conducting food safety inspections and approving Imperial's remedial actions to correct a food safety problem ("fly control"); and (2) the FSIS assuming responsibility for the health and safety of FSIS employees.[8]

---

8. With respect to the FSIS assuming responsibility for the health and safety of FSIS employees, an additional obstacle may exist that forecloses Plaintiffs' attempt to create a tort duty out of Section 324A of the Second Re-

statement of Torts. Section 324A attempts to impose liability in certain circumstances upon only the actor "who undertakes, gratuitously or for consideration, to render services to

Plaintiffs contend that these undertakings place the Government in a position such that North Carolina law, through Section 324A of the Second Restatement of Torts, imposed upon the Government a duty to protect Imperial employees (and others present in the Imperial Plant) from fire hazards. In doing so, Plaintiffs focus almost solely on only one of the six factors identified by the North Carolina Court of Appeals—the degree of certainty that injury will be suffered—and assume that the Government had a duty to protect Imperial workers (and others in the plant) from the risks of fire. An analysis and balancing of the remaining factors demonstrates that Plaintiffs are incorrect.

With regard to the FSIS conducting food safety inspections and approving Imperial's remedial actions to correct a food safety problem, the purpose and intent of the FSIS is to ensure food safety, not workplace safety. The Government's efforts to ensure food safety are intended to have little effect on Imperial workers. Rather, consistent with the text of the PPIA, the purpose of the Government's food safety and inspection measures is to protect "the health and welfare of consumers" "by assuring that [Imperial's] poultry products distributed to them are wholesome." 21 U.S.C. § 451.

Similarly, the FSIS has not exhibited any intent to affect Imperial Plant workers (or others present in the Imperial Plant) through its safety measures on behalf of other FSIS employees. The provisions in FSIS directives dealing with workplace safety are directed at the protection of FSIS employees. In fact, FSIS directives explicitly state that plant owners and man-

agers (not the FSIS) are responsible for fire safety measures regarding doors and exits.

■ Because the Government's food safety measures are not intended to affect Imperial workers, the risk of fire to Imperial workers is not foreseeable to the Government in conducting food safety measures. Plaintiffs suggest that FSIS inspectors should have been aware of state and local building and occupational safety codes and Imperial's alleged noncompliance therewith; however, the FSIS is not charged with enforcing such codes and has no training in such matters. Furthermore, federal agencies often lack the authority to require abatement of hazardous conditions in private sector workplaces. 29 C.F.R. § 1960.1(g). Compliance with state and local building and occupational safety codes is the duty of plant owners and operators, in this case the duty of Imperial Plant management.[9] N.C. Gen.Stat. § 95–129 ("Each employer shall furnish ... a place of employment free from recognized hazards that ... are likely to cause death or serious injury or serious physical harm to his employees [and] shall comply with occupational safety and health standards or regulations ...."). Moreover, the remedial actions taken by Imperial and approved by the Government for food safety purposes are contemplated by FSIS Directive 4791.6 and permitted as long as Imperial Plant management provides necessary safety precautions. (Def.'s Mot. to Dismiss at Ex. 1, Tab B, FSIS Directive 4791.6 at 3.)

another." *Restatement (Second) of Torts* § 324A (1965). In assuming responsibility for the health and safety of its own employees, FSIS acts in its own interest. It does not undertake to render services to another.

9. North Carolina does not permit plant owners or operators to delegate their duties and responsibilities concerning workplace safety and occupational hazards. *E.g., Brooks v. BCF Piping, Inc.,* 109 N.C.App. 26, 426 S.E.2d 282 (1993).

Plaintiffs suggest that the risks of fire at the Imperial Plant should have been foreseeable to FSIS IICs who assumed the responsibility for the safety of other FSIS employees. However, in this regard, IICs' duties are not to enforce state and local building and occupational safety codes but rather to draft floor plans and emergency escape routes for government employees. Compliance with state and local building and occupational safety codes is the duty of Imperial Plant management. The duty to equip properly locked doors in order to enable immediate exits rests with Imperial. It is not within the duties imposed upon the Government, and Imperial's failure to carry out this alleged duty was not foreseeable to the Government.

There is little connection between the Government's food safety measures and the injuries that occurred during the fire. Imperial Plant management engaged in the affirmative act of locking and/or blocking exit doors. The Government's role in these events was a limited one—the approval for food safety purposes of remedial actions taken by Imperial. Again, the locking of doors is contemplated by FSIS Directive 4791.6 and even permitted, provided that Imperial Plant management fulfills its duty of ensuring that the doors can be opened immediately in the event of an emergency. (*Id.*) Further, there is little, if any, connection between the Government's responsibilities to its own food safety inspectors and the harm caused to private sector employees due to the alleged noncompliance with state and local building and occupational safety codes by their private sector employer.

Because the workplace safety of its employees is the responsibility of Imperial Plant management, little moral blame for the tragedy caused by Imperial's noncompliance with state and local building and occupation safety codes attaches to the Government's various undertakings.

FSIS inspectors are not charged with implementing or enforcing state and local building and occupational safety codes. Nor are FSIS inspectors trained in such matters. FSIS focuses primarily upon ensuring that poultry products are safe for consumer consumption and, to a lesser extent, upon the safety and health of its own employees. FSIS should not bear the blame for injuries to private sector employees arising from Imperial's alleged failure to comply with various occupational safety laws.

North Carolina law currently places a duty upon the employer, such as Imperial, to comply with occupational safety laws and to provide and maintain a safe workplace environment. Such a duty is reasonable because employers, as owners and/or operators of private workplaces, are in the best position from which to carry out this duty. Imposing upon the FSIS the duty to protect private sector workers from occupational hazards in private sector workplaces would not further a policy of preventing future harm, the sixth factor for consideration identified by the state court. The imposition of such a duty would be a redundant effort at best because employers already bear this duty. Moreover, FSIS inspectors are not trained to handle matters relating to state and local building and occupational safety codes, and the FSIS is not charged with ensuring compliance with such codes. Consequently, the FSIS is not in a good position to undertake a duty to protect private sector employees from occupational hazards in private sector workplaces. In addition, imposing such a duty on the USDA necessarily would implicate such issues as personnel, training, and funding of the FSIS. It would substantially detract from the FSIS's mission of ensuring that poultry products distributed to consumers are wholesome. Further, it would alter greatly the scope and nature of the purpose of the FSIS, thereby disrupt-

ing the FSIS and increasing significantly the cost of maintaining the FSIS. In sum, imposing a duty on the Government as asserted by Plaintiffs would come at significant cost with negligible benefits.

■ Finally, North Carolina tort law recognizes the principle that the extent of a party's duty and its corresponding extent of liability are limited by the scope of the party's undertaking. *See Cassell*, 344 N.C. at 163–65, 472 S.E.2d at 772–73; *Hoisington v. ZT-Winston-Salem Assocs.*, 133 N.C.App. 485, 489, 516 S.E.2d 176, 179–80 (1999); *Mueller v. Daum & Dewey, Inc.*, 636 F.Supp. 192, 195 (E.D.N.C.1986). In general, the FSIS has undertaken to protect consumers by ensuring that poultry products are wholesome. To a limited extent, the FSIS has undertaken to protect its own employees from workplace hazards. Plaintiffs have provided no reason for extending this undertaking to encompass a duty by FSIS employees to protect private sector employees, such as those injured here, from occupational hazards at a private sector workplace in which a private employer already bears such a duty. Thus, imposition upon the USDA of a duty to protect private sector workers from occupational hazards at private sector workplaces is unwarranted.

Plaintiffs' failure to demonstrate that a state law basis exists for the imposition of a tort duty upon the Government amounts to a failure to state a claim upon which relief may be granted. Accordingly, the Government's motion to dismiss will be granted.

## CONCLUSION

For the foregoing reasons, the Government's motions to dismiss will be granted. Plaintiffs' motions for oral argument on the Government's motions will be denied.[10]

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

10. On March 8, 2002, the court denied Plaintiffs' motion to file a response to Defendant's reply memorandum. Defendant's reply memorandum almost entirely addressed Defendant's argument concerning the discretionary function exception's applicability to Plaintiffs' claims. Because the court has not based its decision on the discretionary function exception and has made a thorough, independent review of Plaintiffs' claims, Plaintiffs have not been prejudiced by the court's denial of further briefing or of oral argument.